UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

In re:                                          Chapter 7

American Camshaft Specialties, Inc.,            Case No. 06-58298

           Debtor.                              Hon. Phillip J. Shefferly
_____/

Basil T. Simon, Trustee,                        Adversary Proceeding No. 08-05578-PJS

           Plaintiff,

v.

Gerdau MacSteel, Inc.,

           Defendant.
_____/

**OPINION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
UNDER SECTION 547(C)(2) OF THE BANKRUPTCY CODE**

**Introduction**

The plaintiff in this adversary proceeding is the Chapter 7 Trustee.  The plaintiff filed this

adversary proceeding under § 547(b) of the Bankruptcy Code to avoid preferential transfers alleged

to have been made to the defendant.  The defendant filed two motions for summary judgment based

upon affirmative defenses raised in the defendant's answer to the complaint.  One of the motions for

summary judgment is based upon the defendant's assertion that the transfers are not avoidable

because of the ordinary course of business defense under § 547(c)(2) of the Bankruptcy Code.  The

other motion is based upon the defendant's assertion that the transfers are not avoidable because of

the subsequent new value defense under § 547(c)(4) of the Bankruptcy Code.  For the reasons

explained in this opinion, the Court grants the defendant's motion for summary judgment under § 547(c)(2) of the Bankruptcy Code. Because the Court grants that motion, it is unnecessary for the Court to reach the other motion.

## Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

## Facts

The following facts are not in dispute. On December 9, 2006, four related companies (collectively referred to as the "Debtor") each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor's business involved the design, production and sale of steel and iron camshafts for original equipment manufacturers in the automotive industry. For over 20 years, the Debtor purchased special bar quality steel from an entity now known as Gerdau MacSteel, Inc., which is the surviving entity after the merger of two predecessor companies, Quanex Corporation and Gerdau Delaware, Inc. (collectively referred to as "Gerdau"). Since at least 1990, Stefan Prociv was the employee of Gerdau who was in charge of managing the Debtor's account with Gerdau. Prociv, who is now the director of credit at Gerdau, was responsible throughout those years for reviewing the transactions between the Debtor and Gerdau, setting the credit limits for the Debtor with Gerdau, evaluating the creditworthiness of the Debtor, and collecting the invoices issued by Gerdau to the Debtor.

After the Debtor filed its Chapter 11 petition, it continued to operate as debtor in possession. The Debtor continued to purchase special bar quality steel from Gerdau during the Chapter 11 case.

Unfortunately, the Chapter 11 case was not successful and, on October 9, 2007, the case was converted to Chapter 7. Basil T. Simon was appointed as the Chapter 7 Trustee.

On November 30, 2008, the Trustee filed a complaint against Gerdau that alleges that Gerdau received payments from the Debtor in the 90 days before the Debtor's bankruptcy case in the aggregate amount of $3,126,021.93, and that those payments are avoidable by the Trustee under § 547(b) of the Bankruptcy Code as preferential transfers. Gerdau answered the complaint, denying liability and asserting various affirmative defenses. After the close of discovery and within the time fixed by the Court for filing dispositive motions, Gerdau filed two separate motions for summary judgment based on its affirmative defenses. The first motion (docket entry no. 48) asserts that the payments identified in the Trustee's complaint are not avoidable as preferential transfers under § 547(c)(2) of the Bankruptcy Code because these payments were for debt incurred by the Debtor in the ordinary course of business or financial affairs of both the Debtor and Gerdau, and that the payments were made both in the ordinary course of business or financial affairs of the Debtor and Gerdau, and according to ordinary business terms. Gerdau's second motion (docket entry no. 51) asserts that the payments are not avoidable as preferential transfers under § 547(c)(4) of the Bankruptcy Code because Gerdau provided subsequent new value to the Debtor. Gerdau asserts that there are no genuine issues of material fact, and that it is entitled to judgment as a matter of law with respect to both of its motions. The Trustee responded to both motions, asserting that there are genuine issues of material fact that preclude the grant of summary judgment on either of Gerdau's two motions. The Court heard oral argument on both motions, and took them under advisement.

**Standard for summary judgment under Rule 56(c)**

Fed. R. Civ. P. 56(c) for summary judgment is incorporated into Fed. R. Bankr. P. 7056. Summary judgment is only appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48. A "genuine" issue is present "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Berryman v. Rieger, 150 F.3d 561, 566 (6th Cir. 1998).

"The initial burden is on the moving party to demonstrate that an essential element of the non-moving party's case is lacking." Kalamazoo River Study Group v. Rockwell International Corp., 171 F.3d 1065, 1068 (6th Cir. 1999). "The burden then shifts to the non-moving party to come forward with specific facts, supported by evidence in the record, upon which a reasonable jury could return a verdict for the non-moving party." Id. "The non-moving party, however, must provide more than mere allegations or denials . . . without giving any significant probative evidence to support" its position. Berryman v. Rieger, 150 F.3d at 566.

**Gerdau's motion for summary judgment
under § 547(c)(2) of the Bankruptcy Code**

Section 547(c) of the Bankruptcy Code contains a number of exceptions to the avoidability of a preferential transfer under § 547(b). Section 547(g) of the Bankruptcy Code makes it clear that a party seeking to avoid a preferential transfer under § 547(b) has the burden of proving the avoidability of the transfer, but that a party seeking to invoke an exception under § 547(c) to the avoidability of a preferential transfer has the burden of proof with respect to such exception.

-4-

Therefore, it is Gerdau's burden in this adversary proceeding to show that the elements of an exception under § 547(c) of the Bankruptcy Code are present. To prevail on its motion for summary judgment, Gerdau must demonstrate that there are no genuine issues of material fact regarding its entitlement to one of the exceptions in § 547(c).

As noted, Gerdau's first motion for summary judgment is brought under § 547(c)(2) of the Bankruptcy Code. That section provides as follows:

> (c) The trustee may not avoid under this section a transfer—
>   . . .
> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>> (B) made according to ordinary business terms[.]

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") amended § 547(c)(2). The ordinary course of business exception of § 547(c) of the Bankruptcy Code has always focused on both the *debt* that was paid by the alleged preferential transfer and on the *transfer* in payment of the debt. A party seeking to invoke § 547(c)(2) of the Bankruptcy Code has always had to demonstrate that the *debt* that was paid by the alleged preferential transfer was incurred in the ordinary course of business or financial affairs of the debtor and the transferee. That was not changed by BAPCPA. However, BAPCPA did substantially change the level of proof that a party seeking to invoke § 547(c)(2) of the Bankruptcy Code must show with regard to the *transfer* itself. Prior to BAPCPA, a party seeking to invoke § 547(c)(2) of the Bankruptcy Code had to show that the transfer (i.e., the payment) was made *both* in the ordinary course of business or financial affairs of the debtor and the transferee *and* that it was made according to ordinary business terms. This two prong showing regarding the transfer was described by the Sixth Circuit Court of Appeals

-5-

as encompassing both a subjective component (i.e., that the transfer was made in the ordinary course of business or financial affairs of the debtor and the transferee) and an objective component (i.e., that it was made according to ordinary business terms).

> The two subsections of § 547(c)(2) under review comprise a subjective and objective component respectively. The subjective prong . . . requires proof that the debt and its payment are ordinary in relation to other business dealings between *that* creditor and *that* debtor. The objective prong . . . requires proof that the payment is ordinary in relation to the standards prevailing in the relevant industry.

Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc.), 957 F.2d 239, 244 (6th Cir. 1992).

The change made by BAPCPA to § 547(c)(2) of the Bankruptcy Code is that it is no longer necessary for a transferee to show that the transfer meets *both* the subjective component and the objective component. BAPCPA removed the conjunctive "and" and replaced it with the disjunctive "or" between the subjective component and the objective component in the text of § 547(c)(2) of the Bankruptcy Code that deals with the transfer. Now, post-BAPCPA, a party can prevail under § 547(c)(2) of the Bankruptcy Code by demonstrating that the *debt* that was paid by the transfer was incurred by the debtor and the transferee in the ordinary course of their business or financial affairs, and that the *transfer* (i.e., the payment) was *either* made in the ordinary course of business or financial affairs of the parties (the subjective component) under § 547(c)(2)(A) *or* that it was made according to ordinary business terms (the objective component) under § 547(c)(2)(B).

There is no dispute in this case over whether the *debt* that was paid by the Debtor to Gerdau was incurred in the ordinary course of their business or financial affairs. Both the Trustee and Gerdau acknowledge that the debt was for the purchase by the Debtor of special bar quality steel from Gerdau for use in the Debtor's ordinary business operations. Instead, the dispute in this case centers on the *transfers* by the Debtor to Gerdau in payment of that debt. Gerdau's motion for

-6-

summary judgment asserts that there are no genuine issues of material fact with respect to the payments under either the subjective component of § 547(c)(2)(A) or the objective component of § 547(c)(2)(B).  Although Gerdau is not required to demonstrate that the payments meet both the subjective component and the objective component after BAPCPA, Gerdau nonetheless argues that it can demonstrate both of them in this case and that it is entitled to summary judgment on either of these two components.  The Court will first consider Gerdau's motion for summary judgment based on the payments meeting the subjective component of § 547(c)(2)(A), and then turn to consideration of the payments under the objective component of § 547(c)(2)(B).

Gerdau's motion for summary judgment
under the subjective component of § 547(c)(2)(A)

In <u>Waldschmidt v. Ranier</u> (<u>In re Fulghum Construction Corp.</u>), 872 F.2d 739 (6th Cir. 1989), the Sixth Circuit Court of Appeals pointed out that there is no definition in the Bankruptcy Code of either "ordinary course of business," as used in the subjective component of § 547(c)(2)(A) of the Bankruptcy Code or "ordinary business terms," as used in the objective component of § 547(c)(2)(B) of the Bankruptcy Code. The <u>Fulghum Construction</u> court noted that the purpose of § 547(c)(2) of the Bankruptcy Code was "'to leave undisturbed normal financial relations, because they do not detract from the general policy of the preference section to discourage unusual action by either the debtor or creditors during the debtor's slide into bankruptcy.'"  <u>Id.</u> at 743 (quoting <u>In re Advance Glove Manufacturing</u>, 761 F.2d 249, 251 (6th Cir. 1985)).  The <u>Fulghum Construction</u> court further observed that "there is no precise legal test" to be applied but, rather, the court should "engage in a 'peculiarly factual' analysis" of the business practices that were unique to the particular parties under consideration.  <u>Id.</u>

-7-

Shortly after it decided <u>Fulghum Construction</u>, the Sixth Circuit court provided more specific guidance regarding the subjective component for determining what transfers were made in the ordinary course of business or financial affairs of a debtor and a transferee in <u>Yurika Foods Corp. v. United Parcel Service</u> (<u>In re Yurika Foods Corp.</u>), 888 F.2d 42 (6th Cir. 1989). "In considering which transactions are ordinary, courts examine several factors, including timing, the amount and manner a transaction was paid, and the circumstances under which the transfer was made." <u>Id.</u> at 45 (citation omitted).

In 1999, in an unpublished opinion, <u>Frank v. Volvo Penta of the Americas, Inc.</u> (<u>In re Thompson Boat Co.</u>, No. 97-1190, 1999 WL 133280 (6th Cir. Feb. 25, 1999) (2-1 decision), the Sixth Circuit further elaborated on what facts are relevant in determining whether a transfer meets the subjective component of being made in the ordinary course of business or financial affairs of a debtor and transferee. The court stated that "[t]he fact that a transfer has been made in late payment of a debt is an important consideration in determining whether the payment is ordinary . . . ." <u>Id.</u> at *5 (citing <u>In re Fred Hawes Org., Inc.</u>, 957 F.3d at 244). The <u>Thompson Boat</u> court went on to explain that "timing is only one consideration in the fact-specific analysis required" by the subjective component of § 547(c)(2) of the Bankruptcy Code. <u>Thompson Boat</u>, 1999 WL 133280 at *6 (citations omitted). The court also observed "that unusual collection activity during the preference period can support a finding that payments made during that period are outside of the ordinary course of business." <u>Id.</u> (citations omitted). Affirming the bankruptcy court's holding that the payments in the <u>Thompson Boat</u> case were not made in the ordinary course of business of the debtor and the transferee, the Sixth Circuit found that it was proper for the bankruptcy court to

-8-

consider the "extraordinary and largely unprecedented action" taken by the creditor to get its debt reduced in that case. Id.

An examination of the subjective component of § 547(c)(2)(A) of the Bankruptcy Code therefore requires a fact specific analysis of the relationship between the debtor and the transferee of a payment that is otherwise avoidable under § 547(b) of the Bankruptcy Code. The case law that has developed under § 547(c)(2) makes clear that one of the most relevant facts to consider is whether there were any changes in the timing of the payments that are sought to be avoided under § 547(b) from other payments made by the debtor to the transferee.

In this case, there is no factual dispute about the timing of the payments made by the Debtor to Gerdau. Prociv testified in his deposition taken on July 7, 2010, (docket entry no. 58, Ex. 6 ("Prociv Dep. Tr.")), that he has worked at Gerdau for 20 years, and that during the entire time that he worked there, the Debtor was a customer of Gerdau. (Prociv Dep. Tr., p. 7, lines 7-12.) Gerdau's invoices to the Debtor provided for "one percent 15 days/net 30." (Prociv Dep. Tr., p. 10, line 23.) Prociv explained that if payment was received within 15 days, then the Debtor would be allowed a 1% discount for the early payment, but otherwise the payment would be due within 30 days. (Prociv Dep. Tr., p. 11, lines 1-4.) Prociv further testified that the ordinary timing of payments throughout the history of the relationship between the Debtor and Gerdau was 60 days. (Prociv Dep. Tr., p. 12, lines 15- 18.) Prociv acknowledged that the Debtor was not technically compliant with the payment terms in place between it and Gerdau as set forth in the invoices, but testified that historically the Debtor had a 60 day pay history. (Prociv Dep. Tr., p. 16, lines 12-15.) Although Prociv did not recall specific dates when the Debtor went past 60 days, Prociv testified that the Debtor may have gone past 60 days at different times and that, if it did, Gerdau, as a matter of

course, would put the Debtor on an account hold. (Prociv Dep. Tr., pp. 13-14.) Prociv testified that this was consistent with Gerdau's policy for its customers generally. (Prociv Dep. Tr., p. 24.) The Trustee did not supply any affidavits, deposition testimony or other evidence in the record to refute these facts.

Prociv also signed an affidavit (docket entry no. 49) in support of Gerdau's motion for summary judgment. Prociv attached several exhibits to his affidavit showing the transactions between the Debtor and Gerdau during the 90 day period immediately preceding the Debtor's bankruptcy case (i.e., September 9, 2006 to December 8, 2006), and during the one year period immediately preceding the 90 day period before the Debtor's bankruptcy case (i.e., September 9, 2005 through September 8, 2006).

Exhibit 1 to Prociv's affidavit identifies each payment received by Gerdau from the Debtor during the 90 days prior to the filing of the bankruptcy case on December 9, 2006. The payments total $2,981,172.80. Exhibit 1 to Prociv's affidavit shows for each payment the invoice number, invoice date, invoice amount, payment number, date of receipt of the payment, amount of the payment, total per payment, and the means by which the payment was made (i.e., check or electronic transfer). Exhibit 3 to Prociv's affidavit shows how many days each invoice was outstanding when each payment was made. Exhibit 3 to Prociv's affidavit shows that on average, payments received by Gerdau during the 90 days before the Debtor's bankruptcy case were 63 days after the date of invoice. Exhibit 3 to Prociv's affidavit further shows that all of the payments during this 90 day period were received within a range of between 56 and 74 days after the date of invoice.

Exhibit 2 to Prociv's affidavit shows all of the payments received by Gerdau from the Debtor during the one year period (i.e., September 9, 2005 through September 8, 2006) immediately

preceding the preference period. Exhibit 2 to Prociv's affidavit shows that during that one year period, Gerdau received payments on an average of 59 days after the date of invoice. That exhibit also shows that over 99% of the payments received during that one year period were within a range of 44 to 74 days after the date of invoice. In other words, Exhibits 2 and 3 taken together show that there were two timing changes in the 90 day period just before the Debtor's bankruptcy case: first, the payments were now received on average 63 days after invoice, rather than 59 days as they previously had been; and, second, the payments were now received within a range of 56 to 74 days after invoice, in contrast to the range of 44 to 74 days after invoice that previously existed.

The Trustee does not dispute the factual content of Prociv's affidavit attesting to the dates and timing of payments either within the 90 day preference period or in the one year immediately preceding the preference period. The Trustee's expert witness, John C. Bohl, prepared a report (docket entry no. 58, Ex. 7) that agrees with this portion of Prociv's affidavit. Bohl's report states that in the one year immediately before the preference period (i.e., September 9, 2005 to September 8, 2006), the "median" payment was 59 days after invoice, and during the 90 day preference period before the Debtor's bankruptcy case (i.e., September 9, 2006 through December 8, 2006), the "median" payment was 63 days after invoice. Bohl's report also identifies a range of dates that the payments were made during the one year period before the preference period, and during the 90 day period just before the bankruptcy case, but the report does not differ with Prociv's statements regarding the range of dates either in the one year period before the 90 day preference period or during the 90 day preference period.

In this case, the evidence is uncontroverted that the Debtor was historically past invoice terms in making its payments to Gerdau, but that it had ordinarily paid around 60 days. During the

-11-

one year before the 90 day preference period, the average time was 59 days, and during the 90 day preference period, it was 63 days. That is not a material change, especially when the lag time between the invoice date and payment date lengthened, rather than shortened. Similarly, the range of dates of payments in the year before the preference period was 44 to 74 days. During the 90 day preference period, it was 56 to 74 days. Again, not a material change. To the extent that the timing of payments is important in considering the subjective component under § 523(a)(2)(A), the timing in this case tends to suggest that the payments to Gerdau during the 90 day preference period were consistent with the past practices of the Debtor and Gerdau.

Another relevant factor in the case law analyzing a payment under the subjective component of § 547(c)(2)(A) is the method of payment. It is undisputed that the Debtor paid Gerdau by check throughout its long time relationship until November, 2006. However, beginning that month, the Debtor made some of the payments to Gerdau by wire transfer. Prociv testified in his deposition that the Debtor's controller, James Hesch, called Prociv to inquire whether Gerdau was capable of receiving electronic payments. (Prociv Dep. Tr., p. 28, lines 10-18). Prociv answered affirmatively, and then described how Hesch asked for routing information to make such payments. According to Prociv, the only information that Hesch provided to Prociv about making payments by wire transfer was that this was a service that the Debtor's bank now provided to the Debtor. (Prociv Dep. Tr., p. 28, lines 20-23.) Prociv recalled that this conversation took place shortly before the first wire transfer payment was received by Gerdau on November 7, 2006. After that conversation, seven of the payments made by the Debtor to Gerdau were made by electronic transfer, and five were made by check. Exhibit 1 to Prociv's affidavit shows that during the entire 90 day preference period, there were 25 separate payments by the Debtor to Gerdau, eighteen by check, and seven by wire transfer.

-12-

Prociv testified unequivocally at his deposition that at no point did he or anyone else at Gerdau either request that the Debtor make payments by wire transfer or suggest to the Debtor to make payments by wire transfer. (Prociv Dep. Tr., p. 30.) The change to wire transfers was entirely initiated and suggested by Hesch to Prociv. (Prociv Dep. Tr., pp. 31-32.) Later in his deposition, Prociv was again asked directly whether there was ever a point when Gerdau suggested that the Debtor switch from payments by check to payments by wire transfer, and Prociv testified without qualification that neither he nor anyone else at Gerdau ever approached the Debtor and suggested or asked that the Debtor switch from checks to wire transfer payments. (Prociv Dep. Tr., p. 63.)

The Trustee did not offer any affidavit or other evidence to controvert Prociv's unequivocal testimony that it was the Debtor that initiated the switch to wire transfer payments in November, 2006. The Trustee did submit an affidavit by Hesch in support of the Trustee's response to Gerdau's motion for summary judgment (docket entry no. 58, Ex. 4). Hesch signed the affidavit on September 3, 2010, after Prociv's deposition was taken on July 7, 2010, and after Prociv's affidavit was signed on August 11, 2010 and attached to the motion for summary judgment filed by Gerdau on August 13, 2010. However, Hesch's affidavit does not address in any respect, let alone controvert, Prociv's unequivocal statements under oath that the Debtor, and not Gerdau, was the party that suggested the change to wire transfer by the Debtor. The only explanation in any deposition transcript, affidavit or other material before the Court regarding why the Debtor began making some of its payments to Gerdau by wire transfer in November, 2006, is Prociv's sworn testimony.

The only material supplied by the Trustee at all regarding the Debtor beginning to use wire transfers in lieu of checks is contained in Bohl's expert report (docket entry no. 58, Ex. 7). Bohl's

report states that before the 90 day preference period, the Debtor "virtually never used electronic funds transfers," but that during the 90 day preference period, Bohl found that the Debtor issued 38 separate wire transfers. Of those 38 wire transfers, Bohl's report states that ten of them were issued to Gerdau. There is a discrepancy between Prociv's affidavit, which only identifies seven wire transfers issued by the Debtor to Gerdau during this period, and Bohl's report, which identifies ten wire transfers. But the more salient point is that Bohl's report does not contradict Prociv's testimony about how and why the Debtor began making some of its payments to Gerdau by wire transfer in November, 2006, nor does it provide even a scintilla of evidence to suggest that the Debtor's use of wire transfers as a means of making payments was somehow the result of any action taken by Gerdau or any suggestion made by Gerdau.

A change in the method of payment can be probative of whether a particular transfer was made in the ordinary of the business or financial affairs of the debtor and the transferee, as required by the subjective component of § 547(c)(2)(A) of the Bankruptcy Code. But a change in the method of payment by itself is not sufficient to conclude that a particular payment was not within the ordinary course of business or financial affairs of the debtor and the transferee. See Central Hardware Co. v. Sherwin-Williams Co. (In re Spirit Holding Co.), 153 F.3d 902, 905-06 (8th Cir. 1998) (finding one wire transfer to be out of the ordinary course of business based on additional circumstances in that it replaced a check that the debtor had stopped payment on, and was made during the week between the parent company's bankruptcy filing and the debtor's petition); Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Intn'l, Inc.), 132 F.3d 104, 109-10 (1st Cir. 1997) (an uncommonly large payment was nearly ten times the average payment; was the only lump sum payment ever made; included new and old invoices, some of the latter being "ancient" by

-14-

accounting standards; was the first time that the debtor paid all outstanding invoices; was the first wire payment; and the first time the defendant's CFO interceded to effectuate the payment); In re Brown Transport Truckload, Inc., 161 B.R. 735, 740 (Bankr. N.D. Ga. 1993) (finding no evidence that the defendant required the debtor to pay by wire transfer); Sims Office Supply, Inc.v. Ka-D-Ka, Inc. (In re Sims Office Supply Inc.), 94 B.R. 744, 749 (Bankr. M.D. Fla. 1988) (payment by cashiers check, when all other payments were by company check, was not sufficient to take the transaction out of the ordinary course of business).

In this case, there is no dispute of fact. The change to begin making payments by wire transfer was initiated solely by the Debtor and not by Gerdau. Prociv's testimony makes clear that Gerdau did not ask for wire transfer payments, but accepted payments by wire transfer from its customers. Bohl's report makes clear that Gerdau began using wire transfers as an additional method of payment for Gerdau and other creditors. In these circumstances, where the change in the method of payment was indisputably initiated by the Debtor and not by Gerdau, such change, by itself, does not mean that the payments made by wire transfer were not made within the ordinary course of business or financial affairs of the Debtor and Gerdau within the subjective component of § 547(c)(2)(A) of the Bankruptcy Code.

In Thompson Boat, the Sixth Circuit recognized that aggressive or unusual collection efforts by a creditor during the 90 day preference period to reduce its balance owed by a debtor can be probative of whether a payment was made in the ordinary course of business or financial affairs under the subjective component. In re Thompson Boat Co., 1999 WL 133280 at *6. In the instant case, Prociv's affidavit states that Gerdau did not take any additional collection actions with respect to the Debtor's outstanding invoices during the 90 day period before the Debtor filed bankruptcy.

-15-

Prociv's affidavit also states that Gerdau did not place any economic pressure on the Debtor during this period to pay outstanding invoices earlier than it had historically paid them, nor did it charge any late fees or interest on outstanding invoices during this 90 day period, nor institute any collection suits for the amounts due on the outstanding invoices. (Docket entry no. 49, Prociv affidavit, ¶¶ 12 and 13.) Prociv's affidavit attests that there were not any material changes to the business relationship between the Debtor and Gerdau during this period. (Prociv affidavit, ¶ paragraph 14.)

Prociv's affidavit is consistent with his deposition testimony. Prociv testified in his deposition without qualification that there were no changes in the relationship between the Debtor and Gerdau during this 90 day period and that, throughout this period, the Debtor and Gerdau "maintained business at a regular rate." (Prociv Dep. Tr. p. 71.) Prociv further pointed out that during the 90 day period, the outstanding balance owing by the Debtor to Gerdau actually increased slightly rather than decreased.

Hesch's affidavit supplied by the Trustee does not controvert Prociv's testimony in any respect. It does not indicate, either expressly or impliedly, that Gerdau undertook any unusual collection efforts against the Debtor during the 90 days before the Debtor's bankruptcy, or placed any economic pressure on the Debtor during that period to reduce the outstanding balance owing by the Debtor to Gerdau.

The Trustee's expert, Bohl, was asked in his deposition on July 13, 2010 whether, in his review of the Debtor's records, he had come across any documents or other information indicating that Gerdau had placed any economic or other pressure upon the Debtor during the preference period to get the Debtor to pay outstanding amounts owed to Gerdau by the Debtor:

-16-

Q. Are there facts in the record of the debtor -- that was one of the sources you -- you mentioned that you looked at -- are there facts in the record of the debtor that indicate that there was pressure placed on AmCam by Gerdau, during the preference period, to switch to paying by electronic means?

A.. I did not see any e-mails, letters, and/or corroborating document that showed that Gerdau was applying pressure to AmCam, specifically.

Q. Okay.

A. Though I searched for it.

Q. Okay, and you'd want to know that if that was the case, that's something you'd be very interested in in reaching your opinion, fair?

A. Absolutely, makes my life easier.

(Docket entry no. 50, Ex. 2, Bohl Dep. Tr., pp. 101-02.)  Bohl testified that he looked through all of the Debtor's records to find some evidence of unusual collection action or other pressure placed by Gerdau on the Debtor.  Bohl was candid in admitting that even though he was motivated to find some evidence of such conduct because it would help the Trustee's case, he did not find a shred of such evidence.

This case is easily distinguishable from the cases cited by the Trustee that involved unusual collection efforts, lawsuits, receiverships and other new or unprecedented action by a creditor against the debtor.  Prociv's unequivocal testimony both in his affidavit and in his deposition that Gerdau placed no pressure, nor instituted any collection or other actions against the Debtor to get the Debtor to make the payments to Gerdau during the 90 days before bankruptcy is unrefuted by the Trustee.  Moreover, this testimony is independently corroborated by the Trustee's own expert, based upon his review of the Debtor's records.  There is no genuine issue of fact regarding whether Gerdau took some action out of the ordinary to induce the Debtor to make the payments to Gerdau during the 90 day preference period.

-17-

Another relevant fact under the case law concerning the subjective component relates to the amounts of the payments that are sought to be avoided under § 547(b) of the Bankruptcy Code. In this case, all of the payments identified in the attachment to Prociv's affidavit match specific invoice amounts, except for two specific payments that Prociv was asked about during his deposition. (Prociv. Dep. Tr., pp. 56-59.) First, Prociv was questioned about a wire transfer on November 15, 2006 in the amount of $170,000.00. That figure does not match a specific invoice. But the next day, the Debtor made a payment of $20,394.56, which, when added to the $170,000.00 wire transfer payment, does add up to a specific invoice amount. Prociv was questioned regarding one other instance where this occurred. On December 6, 2006, a payment was made in an even amount, but when added to another payment made the next day, equaled a specific invoice amount. Prociv could not explain why the Debtor in each of these two instances sent two payments that together added up to specific invoice amounts. He agreed that in each instance, the wire transfer in an even amount (before adding the other payment made the next day) gives the appearance of an "oddball" or "flat amount" payment. However, in each instance, Prociv testified that he did not have any conversation whatsoever with the Debtor regarding these two instances, nor did he ever request a "flat amount" or "lump sum" from the Debtor. When Prociv looked back at the payments, he could only speculate that there must have been something internal with the Debtor that caused the Debtor in each of these two instances to make two payments adding up to specific invoice amounts rather than one payment in the amount of those invoices. In any event, Prociv was clear that these amounts were not requested by Gerdau, and in each instance, when added to the next payment made, matched up to specific invoice amounts.

-18-

The Trustee again does not refute Prociv's explanation regarding these two instances. Hesch's affidavit once again is silent on this topic. Bohl's report likewise does not contradict Prociv's testimony about these payments in any respect.

It is true that these two instances of lump sum payments were somewhat different than all of the other 25 payments made during the 90 day preference period, which each matched specific invoice amounts to the penny. While that does make these payments different than the other payments, it does not necessarily mean that they are not made in the ordinary course of business or financial affairs of the debtor and the transferee within the subjective component of § 547(c)(2)(A) of the Bankruptcy Code. The rest of the circumstances surrounding these two payments are not unusual or different. And the amounts are not unusual if considered along with the next payment following each of them. The inquiry under § 547(c)(2)(A) is not whether the payments during the 90 day preference period are identical in every respect with every other payment ever made by the debtor to the creditor, but only whether they are made in the ordinary course of business or financial affairs. The fact that two payments do not themselves match up with a specific invoice amount is not sufficient by itself to disqualify them from being found to be made in the ordinary course of business or financial affairs of the Debtor and Gerdau.

There are no genuine issues of fact regarding the timing, amount and manner of the payments made by the Debtor to Gerdau that the Trustee seeks to avoid. However, although the Trustee does not dispute those facts, the Trustee argues that Gerdau is not entitled to summary judgment on the subjective component of § 547(c)(2)(A) because there are other circumstances surrounding the payments that create a genuine issue of fact as to whether the payments were made in the ordinary course of business or financial affairs of the Debtor and Gerdau. First, the Trustee points to several

-19-

statements in Hesch's affidavit. (Docket entry no. 58, Ex. 4.) The Hesch affidavit states that on or about October 6, 2006, the Debtor's lender reduced its line of credit to the Debtor by approximately $2 million; that the Debtor had insufficient cash to operate or pay debts, and notified its customers that it could not maintain operations; that in order to avoid interruptions to their product supply, on or about October 20, 2006, the Debtor's customers signed a customer funding and setoff agreement with the Debtor; that there was an approximately two to three week gap in payments by the Debtor to suppliers caused by its funding limitations; that, generally speaking, the Debtor's payments to its suppliers during this period were made only to creditors that would not ship products without payment; and that Gerdau would not ship product to the Debtor unless Gerdau had been paid for invoices 60 days or older.

In the Court's view, none of the statements in Hesch's affidavit create a genuine issue of material fact regarding whether the payments by the Debtor to Gerdau during the 90 day preference period were within the ordinary course of business or financial affairs of the Debtor and Gerdau. The fact that the Debtor's lender reduced its line of credit to the Debtor does not somehow automatically disqualify any subsequent payments by the Debtor to Gerdau or, for that matter, to any of its other creditors, from being within the ordinary course of business or financial affairs of the Debtor and the transferee of such payment. Reductions in lines of credit occur regularly in lending relationships, especially so in lending relationships where the borrower subsequently ends up in bankruptcy. If a pre-petition reduction in a debtor's line of credit is enough to disqualify any subsequent payments from being treated as in the ordinary course of that debtor's business, then it is safe to say that few payments would ever qualify under the subjective component of § 547(c)(2)(A). More importantly, Hesch's affidavit does not state or even imply that the reduction

-20-

in the Debtor's line of credit and the Debtor's agreement with its customers affected in any way the timing or amounts of any of the payments that are the subject of the Trustee's complaint. Second, Hesch's affidavit does not indicate, either directly or indirectly, that Hesch ever informed Prociv or anyone else at Gerdau about a reduction in the Debtor's line of credit on or about October 6, 2006, or about the execution by the Debtor's customers of a funding and setoff agreement on or about October 20, 2006. There is no evidence that Gerdau ever knew of these events. Further, even if Gerdau did know of these events, it does not follow that any payments made by the Debtor to Gerdau (or to any other creditor) after the dates of these events are automatically disqualified from being treated as payments in the ordinary course of the business or financial affairs of the Debtor and the transferee after that date. Nor do Hesch's generalized statements in his affidavit that limitations in the Debtor's financing caused gaps in payments to (unnamed) suppliers, and left the Debtor with insufficient cash to pay its debts, disqualify the challenged payments to Gerdau from constituting ordinary course payments under § 547(c)(2)(A).

The most relevant statements in Hesch's affidavit to the Court's consideration of the subjective component under § 547(c)(2)(A) are contained in paragraphs 6 and 7 of the affidavit. In paragraph 6, Hesch states that "During this period, Debtors' payments to its suppliers were generally made only to those creditors that would not ship product without payment." This paragraph does not identify specific dates for the period that Hesch is referring to, nor does it identify Gerdau as one of the suppliers that would not ship product without payment. Paragraph 7 of Hesch's affidavit contains the statement that "Gerdau would not ship product to Debtors unless it had been paid for invoices 60 days or older." Again, paragraph 7 does not identify a time frame that Hesch is referring to, nor does it say that Gerdau ever refused to ship product to the Debtor to compel the Debtor to

make any of the payments that the Trustee seeks to avoid under § 547(b). Do these statements create a genuine, material issue of fact?

In his deposition, Prociv testified that it was "a matter of course" for Gerdau to put accounts on hold if they were in excess of 60 days. (Prociv Dep. Tr., pp. 13-14, 24.) Prociv testified that this policy was not unique to Gerdau's dealings with the Debtor. Hesch's statement in paragraph 7 of his affidavit is consistent with Prociv's testimony in that regard. But there is no evidence, either in Prociv's deposition, or in Hesch's affidavit, that any of the payments made by the Debtor to Gerdau that the Trustee seeks to avoid were made because of a refusal by Gerdau to ship product to the Debtor during the 90 days before bankruptcy. Nowhere in paragraphs 6 or 7, or anywhere else in his affidavit, does Hesch say that Gerdau refused during the 90 day preference period to ship product to the Debtor to get the Debtor to pay, nor that the Debtor did pay because of some refusal by Gerdau to ship product. Prociv's deposition testimony and affidavit are detailed and clear: there was no economic pressure placed on the Debtor by Gerdau to pay any of the invoices during the 90 day preference period. The statements in Hesch's affidavit that the Debtor's payments to its suppliers were generally made only to creditors that would not ship product without payment, and that Gerdau had a policy that it would not ship product unless it was paid for its invoices 60 days or older, are simply not enough to create a genuine, material issue of fact regarding the payments that the Trustee seeks to avoid in this case. Accepting, as the Court must for purposes of a motion for summary judgment, that all of the statements in Hesch's affidavit are true, the Court does not find that any of those statements create a genuine issue of material fact as to whether the payments sought to be avoided by the Trustee were made in the ordinary course of the business or financial affairs of the Debtor and Gerdau.

-22-

Further, at oral argument on Gerdau's motions for summary judgment, counsel for the Trustee informed the Court that if the motions for summary judgment are denied, and the case proceeds to trial, Hesch will not be testifying at trial because the Trustee and Gerdau have stipulated to introduce Hesch's affidavit into evidence in lieu of his live testimony. Therefore, the Court already has before it all of the testimony that Hesch will provide in this case. All of the statements in Hesch's affidavit are consistent with Prociv's deposition testimony and affidavit. None of the statements in Hesch's affidavit create a genuine issue of material fact as to whether any of the payments that the Trustee seeks to avoid were made in the ordinary course of business or financial affairs of the Debtor and Gerdau.

The Sixth Circuit Court of Appeals instructs that a determination of whether a payment is in the ordinary course of business under the subjective component of § 547(c)(2)(A) of the Bankruptcy Code is a "peculiarly factual" analysis that examines the business practices between the specific debtor and the specific transferee of the payment. Waldschmidt v. Ranier (In re Fulghum Construction Corp.), 872 F.2d 739, 743 (6th Cir. 1989). The trial court's task in such cases is to determine whether the payments at issue are ordinary. That does not mean that they have to be identical in every respect to every transaction between a debtor and a transferee that ever occurred. Rather, the payments must be ordinary in the sense of being consistent with the past practices of the parties. As explained by the Sixth Circuit in Fulghum, the purpose of the subjective component of § 547(c)(2) is "to leave undisturbed normal financial relations, because they do not detract from the general policy of the preference law to discourage unusual actions by debtors or creditors during a debtor's slide into bankruptcy." Id. (internal quotation marks and citation omitted).

In this case, the record is clear that the payments made by the Debtor to Gerdau within the 90 days before bankruptcy were consistent with past practice and with the normal relations of the parties. The timing and amounts of the payments during the 90 days before bankruptcy were not materially different than the timing and amounts before that period of time. The record is devoid of evidence that Gerdau undertook any collection activities or practices during the 90 days before bankruptcy that were in any way different than its past practices and policies. The only significant factual distinction in the 90 days before bankruptcy is that some of the payments were made by the Debtor in the form of wire transfer rather than check. But the uncontroverted explanation for that change is that it was initiated by the Debtor during this period, and had nothing to do with any action by Gerdau to try to somehow get its balance reduced, or action by the Debtor to somehow accelerate payment of the balance it owed to Gerdau in preference to its other creditors.

The determination of whether payments are in the ordinary course of business for purposes of the subjective component of § 547(c)(2)(A) is a factual determination. The fact intensive analysis required by controlling Sixth Circuit precedent means that disposition of such cases by summary judgment is unusual. But that does not mean that an ordinary course of business defense under the subjective component of § 547(c)(2)(A) can never be decided on a motion for summary judgment. The question is whether there exists a *genuine* issue of *material* fact for trial. In this case, the Court concludes that there are no genuine issues of material fact for trial. The payments that the Trustee seeks to avoid were made by the Debtor within the ordinary course of business or financial affairs of the Debtor and Gerdau. Therefore, the Court is required to grant Gerdau's motion for summary judgment on the Trustee's complaint pursuant to § 547(c)(2)(A).

-24-

As explained earlier in this opinion, Gerdau argues that even if it is not entitled to summary judgment under the subjective component of § 547(c)(2)(A) of the Bankruptcy Code, it is independently entitled to summary judgment under the objective component of § 547(c)(2)(B) because the payments sought to be avoided by the Trustee were all made according to ordinary business terms. Under § 547(c)(2)(B), a trustee may not avoid a transfer in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee if "such transfer was . . . made according to ordinary business terms[.]" In assessing ordinary business terms under § 547(c)(2)(B), the Sixth Circuit has directed that this Court must determine

> what is ordinary in the particular industry involved. . . . [C]ourts do not look only at the manner in which one particular creditor interacted with other similarly situated debtors, but rather analyze whether the particular transaction in question comports with the standard conduct of business within the industry.

Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc.), 957 F.2d 239, 245-46 (6th Cir. 1992). The Sixth Circuit has also held "that 'ordinary business terms' means that the transaction was not so *unusual as to render it an aberration* in the relevant industry." Luper v. Columbia Gas of Ohio, Inc. (In re Carled, Inc.) 91 F.3d 811, 818 (6th Cir. 1996) (emphasis added). As noted above, the Sixth Circuit has referred to the "ordinary business terms" test as the objective component of the defense under § 547(c)(2).

The Trustee argues that the objective test under § 547(c)(2)(B) has changed post-BAPCPA. Under the pre-BAPCPA version of the statute, a party seeking to invoke § 547(c)(2) had to prove both the subjective and objective prongs. According to the Trustee, pre-BAPCPA courts historically

-25-

focused on the subjective prong, sometimes all but ignoring the objective prong. As a result, the Trustee concludes that pre-BAPCPA cases construing "ordinary business terms" are "less instructive" because those cases, with their cursory analysis, subordinated the importance of the objective prong. See Hutson v. Branch Banking & Trust Co. (In re National Gas Distributors, LLC), 346 B.R. 394, 404 (Bankr. E.D. N.C. 2006) (finding that "ordinary business terms" acquired new meaning in becoming an independent defense post-BAPCPA). Despite the Trustee's citation to National Gas Distributors, the Trustee does not explain exactly *how* the standard under § 547(c)(2)(B) has changed. Moreover, although revisiting the ordinary business terms standard might be warranted in other circuits where controlling precedent is unclear, the Sixth Circuit Court of Appeals has articulated a clear and consistent standard, from which this Court sees no reason to deviate. See Luper v. Columbia Gas of Ohio, Inc., 91 F.3d at 818.

For purposes of its motion, Gerdau accepts the Trustee's contention that the iron and steel mill industry is the proper industry for the Court to consider. The parties' arguments instead focus on two points as being relevant to determining whether the transfers at issue were made according to ordinary business terms: the timing of the payments in relation to the invoice date, and the use of wire transfers. Both parties used expert witnesses to locate industry data on those points, compare that data with the transfers at issue in this case, and render their opinions as to whether the transfers fell within industry standards.

With respect to the timing issue, Gerdau provided portions of the deposition transcripts of its expert, Brian Phillips, and the Trustee's expert, Bohl. In addition, Gerdau attached portions of industry reports. Gerdau did not provide the Court with Phillips' expert report. In his deposition, Phillips testified that he used a Dunn & Bradstreet (D & B) report with separate charts for 2005 and

-26-

2006 data (docket entry no. 50, Exs. 6-3 and 6-4). Phillips clarified in his deposition testimony that he did not use a D & B report with 2006 and 2007 data, as the years at issue in this case were 2005 and 2006. The D & B report chart for 2005 indicates an average collection period of 33.6 days for respondent businesses in the 25th percentile in the iron and steel mill industry; 44.8 days for respondent businesses in the 50th percentile; and 69.7 days for respondent businesses in the 75th percentile. The D & B report chart for 2006 data indicates a similar average collection period of 33.8 days for the 25th percentile; and 43.8 days for the 50th percentile. However, for the 75th percentile, the average collection period in 2006 had shortened from 69.7days to 56.6 days. Gerdau also relies on portions of an undated Risk Management Association (RMA) report that it believes contains data for 2005 and 2006 (docket entry no. 50, Ex. 6-5). The portion of the RMA report provided by Gerdau is difficult to decipher, but it appears to indicate average collection periods of 31, 44 and 60 days for the 25th, 50th and 75th percentiles, respectively.

To recap, the collection information in the identified reports for the 75th percentile of respondent businesses in the relevant industry was 56.6, 60.0, and 69.7 days. The average of these numbers is 62.1 days. The number of days between the invoice date and payments received by Gerdau during the 90 day preference period ranged from 56 days to 74 days, with an average of 63 days. The number of days for receipt of payments at issue in this case are slightly outside, but consistent with, the 75th percentile of respondent businesses in the iron and steel mill industry as compiled in the D & B and RMA reports.

Bohl was questioned about the same D & B report in his deposition (docket entry no. 50, Ex. 6-2), and was asked about the identical industry figures in the chart containing 2006 data. Bohl was also questioned concerning the RMA report, testifying that it reflects similar percentiles to the

-27-

D & B data. Bohl concluded that the timing of the subject payments in this case was not in accordance with ordinary business terms. Bohl reached his conclusion based upon his belief that the timing could only qualify as ordinary business terms if the timing was consistent with the timing reported by at least 50% of the respondent businesses within the relevant industry. Phillips reached a contrary conclusion, opining that the timing of the payments made by the Debtor to Gerdau during the preference period was in accordance with ordinary business terms.

There are no genuine issues of fact concerning the timing of when Gerdau submitted its invoices or when the Debtor sent payments. Further, both expert witnesses went to the same sources for the same industry for comparison data. The Court need not accept the legal conclusions of either expert as to whether the timing of the transfers in this case was according to ordinary business terms, but instead must examine the undisputed facts in this case, compare them to the relevant industry data assembled by the experts, and then apply the standard required by the Sixth Circuit Court of Appeals. The Sixth Circuit was clear in its ruling that it

> reject[ed] the definition of "ordinary business terms" adopted by the district court, which would require that the transactions at issue resemble a *majority* of the industry's transactions, and [ ] also reject[ed] the definition adopted by the bankruptcy court requiring [the defendant] to establish the lateness as a pattern for a *significant* percentage of specific customers.

Luper v. Columbia Gas, 91 F.3d at 818 (emphasis in original). The evidence in this case shows that the challenged payments were at or very close to the payments received by respondent businesses in the 75th percentile of the relevant industry. That is not "aberrational, unusual, or idiosyncratic." It is irrelevant under the Luper standard that the timing of the payments in this case was not the same as that of a majority of businesses in this industry. The timing of the payments was in accordance with ordinary business terms.

-28-

The second point of disagreement between the Trustee and Gerdau is whether the Debtor's use of electronic wire transfers for the first time during the preference period took those payments out of the realm of ordinary business terms. Gerdau relies on its expert witness, Phillips. Phillips used a 2007 Electronic Payments Survey by the Association for Financial Professionals ("AFP Survey") (docket entry no. 50, Ex. 6-6). Phillips focused on figures for payments made to major suppliers by businesses with annual revenues under $1 billion as most closely resembling the Debtor. The introduction to the AFP Survey notes that "[p]ayments are undergoing an unprecedented period of change because of the decline of the check in favor of electronic payments . . . ." (Docket entry no. 50, Ex. 6-6, p.1.) In discussing payments to major suppliers, the AFP Survey found that although "check use is almost universal (98 percent) among organizations to pay major suppliers, the full range of electronic payments methods has been widely adopted. Eighty percent of organizations use wire transfers to pay major suppliers . . . ." (Docket entry no. 50, Ex. 6-6, p.6.) Looking specifically at businesses with revenues under $1 billion, those organizations made payments to their major suppliers by check 71% of the time and by wire transfers 10% of the time. (Docket entry no. 50, Ex. 6-6, p.7.)

In response, the Trustee argues that Phillips acknowledged there are issues with the AFP Survey in that it is not broken down by year or segregated by industry. Further, the Trustee identifies a number of specific statements in Bohl's report that take issue with some of Phillips' testimony. The Trustee also points out specific questions during Phillips' deposition that called on Phillips to speculate as to why the Debtor may have used wire transfers, perhaps in response to a stop shipment order, and whether an inference could be drawn from that possibility that Gerdau somehow pressured the Debtor into making the wire transfers. The Trustee also points to Bohl's

deposition testimony where Bohl concluded that the Debtor's use of wire transfers "was likely the result of pressure" from Gerdau. Finally, the Trustee argues that Gerdau submitted no evidence in support of its motion, and cannot rely on "snippets" from Bohl's report while ignoring Bohl's ultimate conclusion that the transfers were made outside ordinary business terms.

Contrary to the Trustee's argument, Gerdau did submit evidence in the form of the AFP Survey. In his deposition, Bohl agreed that the AFP survey contains the most relevant and informative data, and he testified that he was not aware of any other industry information that would provide a more detailed analysis than what is contained in the AFP Survey. (Docket entry no. 50, Ex. 6-2.) Bohl also agreed that the subcategories used by Phillips contain the most fitting data. Although Bohl disputed certain specific statements of Phillips, ultimately both expert witnesses agreed that the AFP Survey provided the best data on the issue of whether the wire transfers made by the Debtor to Gerdau were within ordinary business terms. A dispute between experts going to the ultimate legal conclusion does not create a genuine issue of material fact. The Court, having before it both the incidents of wire transfers made by the Debtor to Gerdau and the data from the AFP Survey, can make its own comparisons and reach its own conclusions. Applying the standard from <u>Luper v. Columbia Gas,</u> the Court concludes that the wire transfers were made according to ordinary business terms. The use of wire transfers in this case was not "aberrational, unusual, or idiosyncratic," but, to the contrary, was consistent with the findings reported in the AFP Survey.

The Trustee's identification of deposition testimony by Bohl and Phillips that speculates on whether Gerdau pressured the Debtor into making the payments by wire transfer is irrelevant to the objective analysis that § 547(c)(2)(B) requires. Even if it were relevant to § 547(c)(2)(B), there is nothing in Bohl's deposition or his rebuttal report that provides a foundation for his testimony as to

-30-

what may have happened between the Debtor and Gerdau to occasion the Debtor's use of wire transfers to Gerdau. Bohl's view of what "likely" happened appears to be just his own speculation. Similarly, the deposition questions of Phillips that the Trustee relies on also called on Phillips to speculate about pressure that may have been placed on the Debtor by Gerdau. Phillips was clear that he had no personal knowledge of any such pressure. In any event, unsupported speculation by either Bohl or Phillips regarding why the Debtor may have made some payments by wire transfer, does not make the Debtor's wire transfer payments "aberrational, unusual, or idiosyncratic." There are no genuine issues of material fact that the wire transfers made by the Debtor to Gerdau during the preference period were made according to ordinary business terms.

In sum, the Court concludes that there are no genuine issues of material fact regarding whether the payments challenged by the Trustee were made according to ordinary business terms. Therefore, the Court is required to grant Gerdau's motion for summary judgment on the Trustee's complaint pursuant to § 547(c)(2)(B).

## Conclusion

Gerdau is entitled to summary judgment under both § 547(c)(2)(A) and § 547(c)(2)(B). The Court will enter an order granting such relief consistent with this opinion. Because the Court is granting Gerdau's first motion for summary judgment, it is unnecessary for the Court to reach Gerdau's second motion for summary judgment. The Court will enter a separate order so providing.

Signed on February 09, 2011

      /s/ Phillip J. Shefferly
       Phillip J. Shefferly

United States Bankruptcy Judge

-32-